IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 21-cv-00439-STV

A.G.,[1]

    Plaintiff,

v.

COMMISSIONER, SOCIAL SECURITY ADMINISTRATION,

    Defendant.
_____

**ORDER**
_____

Magistrate Judge Scott T. Varholak

    This matter is before the Court on Plaintiff A.G.'s Complaint seeking review of the Commissioner of Social Security's decision denying Plaintiff's application for supplemental security income ("SSI") under Title XVI of the Social Security Act ("SSA"), 42 U.S.C. §§ 1381 and 1383c. [#1]  The parties have consented to proceed before this Court for all proceedings, including the entry of final judgment, pursuant to 28 U.S.C. § 636(c) and D.C.COLO.LCivR 72.2.  [#12]  The Court has jurisdiction to review the Commissioner's final decision pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).  This Court has carefully considered the Complaint [#1], the Social Security Administrative Record [#15], the parties' briefing [##18, 21, 22], and the applicable case law, and has determined that oral argument would not materially assist in the disposition of this appeal. For the following reasons, the Court **AFFIRMS** the Commissioner's decision.

---

[1] Pursuant to D.C.COLO.LAPR 5.2(b), "[a]n order resolving a social security appeal on the merits shall identify the plaintiff by initials only."

I.     **LEGAL STANDARD**

    A.     **Five-Step Process for Determining Disability**

The SSA defines disability as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."[2] 42 U.S.C. § 423(d)(1)(A); *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007). "This twelve-month duration requirement applies to the claimant's inability to engage in any substantial gainful activity, and not just his underlying impairment." *Lax*, 489 F.3d at 1084. "In determining whether an individual's physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility . . ., the Commissioner [ ] shall consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity." 42 U.S.C. § 423(d)(2)(B).

"The Commissioner is required to follow a five-step sequential evaluation process to determine whether a claimant is disabled." *Hackett v. Barnhart*, 395 F.3d 1168, 1171 (10th Cir. 2005). The five-step inquiry is as follows:

1. The Commissioner first determines whether the claimant's work activity, if any, constitutes substantial gainful activity;

---

[2] "Substantial gainful activity" is defined in the regulations as "work that (a) [i]nvolves doing significant and productive physical or mental duties; and (b) [i]s done (or intended) for pay or profit." 20 C.F.R. § 416.910; *see also* 20 C.F.R. § 416.972.

2. If not, the Commissioner then considers the medical severity of the claimant's mental and physical impairments to determine whether any impairment or combination of impairments is "severe;"[3]

3. If so, the Commissioner then must consider whether any of the severe impairment(s) meet or exceed a listed impairment in the appendix of the regulations;

4. If not, the Commissioner next must determine whether the claimant's residual functional capacity ("RFC")—*i.e.*, the functional capacity the claimant retains despite his impairments—is sufficient to allow the claimant to perform his past relevant work, if any;

5. If not, the Commissioner finally must determine whether the claimant's RFC, age, education and work experience are sufficient to permit the claimant to perform other work in the national economy.

*See* 20 C.F.R. § 416.920(a)(4); *Grogan v. Barnhart*, 399 F.3d 1257, 1261 (10th Cir. 2005); *Bailey v. Berryhill*, 250 F. Supp. 3d 782, 784 (D. Colo. 2017). The claimant bears the burden of establishing a *prima facie* case of disability at steps one through four, after which the burden shifts to the Commissioner at step five to show that the claimant retains the ability to perform work in the national economy. *Wells v. Colvin*, 727 F.3d 1061, 1064 n.1 (10th Cir. 2013); *Lax*, 489 F.3d at 1084. "A finding that the claimant is disabled or not disabled at any point in the five-step review is conclusive and terminates the analysis." *Ryan v. Colvin*, 214 F. Supp. 3d 1015, 1018 (D. Colo. 2016) (citing *Casias v. Sec'y of Health & Human Servs.*, 933 F.2d 799, 801 (10th Cir. 1991)).

B. **Standard of Review**

In reviewing the Commissioner's decision, the Court's review is limited to a determination of "whether the Commissioner applied the correct legal standards and whether her factual findings are supported by substantial evidence." *Vallejo v. Berryhill*,

---

[3] The regulations define severe impairment as "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 416.920(c).

849 F.3d 951, 954 (10th Cir. 2017) (citing *Nguyen v. Shalala*, 43 F.3d 1400, 1402 (10th Cir. 1994)).  "With regard to the law, reversal may be appropriate when [the Commissioner] either applies an incorrect legal standard or fails to demonstrate reliance on the correct legal standards."  *Bailey*, 250 F. Supp. 3d at 784 (citing *Winfrey v. Chater*, 92 F.3d 1017, 1019 (10th Cir.1996)).

"Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  It requires more than a scintilla, but less than a preponderance."  *Wall v. Astrue*, 561 F.3d 1048, 1052 (10th Cir. 2009) (quoting *Lax*, 489 F.3d at 1084).  "Evidence is not substantial if it is overwhelmed by other evidence in the record or constitutes mere conclusion."  *Grogan*, 399 F.3d at 1261-62  (quoting *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992)).  The Court must "meticulously examine the record as a whole, including anything that may undercut or detract from the [Commissioner's] findings in order to determine if the substantiality test has been met.'"  *Flaherty v. Astrue*, 515 F.3d 1067, 1070 (10th Cir. 2007) (quotation omitted).  The Court, however, "will not reweigh the evidence or substitute [its] judgment for the Commissioner's."  *Hackett*, 395 F.3d at 1172.

## II.   BACKGROUND

Plaintiff was born in 1981.  [AR 239][4]  Plaintiff can read and write in English but does not speak English and prefers to speak Korean.  [AR 271]  Plaintiff has completed one year of college.  [AR 273]  On November 14, 2017, Plaintiff filed an application for SSI.  [AR 239-44]  In the application, Plaintiff claimed a disability onset date of March 29,

---

[4] All references to "AR" refer to the sequentially numbered Social Security Administrative Record filed in this case.  [#15]

2017, and thus Plaintiff was 36 years old at the time of the alleged onset.  [AR 239]  Plaintiff claims disability based upon epilepsy/seizures, depression, and anxiety.  [AR 272]  Plaintiff previously worked as a bus boy in 1999 and as a cleaner in a dental office from 2001 to 2002.  [AR 273]  Plaintiff has not performed any work since the alleged onset date of March 29, 2017.  [*Id.*]

     A.     **Medical Background**

Plaintiff began experiencing seizures when he was eight years old after falling and striking his head, causing a mild traumatic brain injury.  [AR 344, 450]  Beginning in 2011, Plaintiff began having laughing seizures and, in 2015, he began having spells where he would make noises and lean to one side.  [AR 451]  Records from December 2015 reflect a diagnosis of seizure disorder and partial symptomatic epilepsy with complex partial seizure disorders.  [AR 367]

From May 3 through May 6, 2016, Plaintiff was hospitalized due to his seizures.  [AR 449-62]  During his hospitalization, he had three seizure events.  [AR 461]  Medical records from June 2016 indicate increased seizures, up to five or more per day, the timing of which coincided with Plaintiff taking Keppra.  [AR 447-48]  Eventually, Plaintiff was taken off Keppra.  [AR 499]

Records from November 28, 2016 indicate that Plaintiff had excellent seizure control with a combination of Depakote, Dilantin, and Vimpat.  [AR 340-41]  At that point, Plaintiff had been seizure-free for three or four months.  [AR 340]  Plaintiff did not report any significant side effects from the medications.  [*Id.*]

In April 2017, Plaintiff suffered from two seizures.  [AR 339]  And  records  from June 19, 2017 reflect increased seizure frequency.  [AR 337]  These records indicate that

Plaintiff had been seizure-free for about seven months, but that the seizures had returned. [AR 337]  A Depakote level was ordered and the treating physician noted that Plaintiff's Depakote level would likely need to be increased.  [AR 339]

Records from November 2017 indicate that Plaintiff's control of his seizures had been "much better the last several years" and that the incidence of seizures was "markedly reduced on [Plaintiff's] current regiment."  [AR 333]  Records from July 2018 likewise indicate that "overall seizure control the last several months ha[d] been very good on [Plaintiff's] current regimen."  [AR 501]  By April 2019, Plaintiff was averaging one atypical, non-generalized seizure per month.  [AR 494]  The most recent seizures were described as vocalizations with some evident confusion but without generalized seizure activity.  [*Id.*]  By 2019, Plaintiff had not had a generalized seizure in several years.  [AR 496]

In addition to suffering from seizures, Plaintiff has also been diagnosed with long-term depression of uncertain relation to his seizure disorder or medications.  [AR 333, 384]  Notes from a June 2, 2016 medical appointment reflect depression and irritability since Plaintiff began taking Keppra.  [AR 449]  Again, Plaintiff was eventually taken off Keppra.  [AR 499]

Records from November 2017 indicate that Plaintiff admitted to having blue moods and occasional tearful spells, but denied suicidal thoughts.  [AR 333]  His affect was described as "quite depressed."  [AR 334]  According to these records, Plaintiff's "[m]ain problem seem[ed] to be severe chronic amotivation and discouragement."  [AR 333]

Records from July 31, 2018 likewise indicated low motivation.  [AR 394-95]  Plaintiff indicated that the seizure medications made his depression worse.  [AR 394]  His

depression was described as "significant." [AR 502] During an August 12, 2018 medical appointment, Plaintiff described his anxiety as worrying about things going bad in the future and having "too many things going on in [his] head at one time." [AR 384] His affect was described as flat, but he had good hygiene and his thought process was described as logical. [AR 387] He did not have suicidal ideations. [AR 388]

In August 2018, Plaintiff began treatment for his depression. [AR 394-99] Notes from an August 22, 2018 therapy session reflect that Plaintiff was diagnosed with moderate to major depressive disorder with mild anxious distress. [AR 396] Plaintiff indicated his symptoms had worsened in the last five years. [*Id.*]

Notes from two September 2018 counseling sessions indicate that Plaintiff was making moderate progress toward his treatment goals. [AR 399, 402] During the September 19 counseling session Plaintiff acknowledged worried, ruminating thoughts, but described his anxiety as a three or four out of ten, whereas it had previously been a seven or eight out of ten. [AR 402] During an October 3, 2018 counseling session, Plaintiff indicated that he believed therapy was "working." [AR 404]

During an October 17, 2018 therapy session, however, Plaintiff stated that he had been having a difficult couple of weeks because he had had another seizure. [AR 406] The seizure was a trigger that led to low motivation and "feeling down." [*Id.*] A November 7, 2018 therapy note indicated that Plaintiff was making "moderate progress" toward his therapy goals, but noted that Plaintiff was struggling with behavioral interventions and motivation. [AR 408] And a November 21, 2018 therapy note stated that Plaintiff "appear[ed] to be plateauing in progress." [AR 410]

During a December 19, 2018 therapy session, Plaintiff reported an increase in his depression symptoms.  [AR 412]  Plaintiff said that he had feelings that "something bad may happen."  [*Id.*]  During a January 16, 2019 therapy session, Plaintiff stated that his depression had worsened over the previous month.  [AR 414]  His therapist noted that Plaintiff "appear[ed] to be feeling stuck in progress towards [his] treatment goals."  [*Id.*]

On February 15, 2019, Plaintiff and his primary care physician discussed starting Plaintiff on antidepressant therapy, beginning with a low dose of Lexapro.  [AR 495]  Nonetheless, February and March 2019 therapy notes reported "minimal progress" toward treatment goals.  [AR 416, 418]  By April 2019, however, Plaintiff reported that he had been more active and notes from two therapy sessions stated that Plaintiff appeared to be making "moderate progress" toward his therapy goals.  [AR 420, 422]  Notes from a May 29, 2019 therapy session likewise reflect "moderate progress" toward treatment goals.  [AR 424]  During that therapy session, Plaintiff stated that he had been "doing better" mentally.  [*Id.*]  During a June 14, 2019 therapy session, Plaintiff noted that he had had seizure episodes but had "got over them pretty quickly and didn't feel sad."  [AR 426]  Notes from two June 2019 therapy sessions continued to reflect "moderate progress" toward treatment goals.  [AR 426, 428]  And an October 14, 2019 treatment note likewise reflect that Plaintiff was making "moderate progress" toward his treatment goals.  [AR 523]

Records from February 2020, however, indicate that Plaintiff's depression had worsened following Kobe Bryant's death, that Plaintiff had been spending most of his time in bed, and that he was "making minimal progress towards his treatment goals."  [AR 56, 561, 563]  Records from March 10, 2020 likewise reflect "minimal progress."  [AR 567]

Records from March 26, 2020, however, reflect "moderate progress" toward treatment goals, though also increased anxiety due to COVID-19 fears. [AR 570] Records from April and May 2020 likewise reflect "moderate progress" but increased anxiety due to COVID-19. [AR 573, 576, 579, 582]

### B. Opinion Evidence

On March 9, 2017, Joseph Michael Murphy, M.D., a treating physician, drafted a letter opining that Plaintiff "has had an unstable seizure disorder since age 8 [and] has been unable to work since that time." [AR 377]

On January 26, 2018, the State agency medical consultant, Robert Pratt, M.D., submitted a physical residual functional capacity assessment. [AR 107-08] Dr. Pratt opined that Plaintiff could never climb ladders, ropes or scaffolds, and that Plaintiff needed to avoid all exposure to hazards. [*Id.*] Dr. Pratt did not impose any other physical restrictions on Plaintiff's ability to work. [*Id.*]

On March 6, 2018, Plaintiff underwent a consultative examination with Sandra E. Eisemann, Ph.D. [AR 344-50] Dr. Eisemann noted that Plaintiff had a mildly depressed mood with a flat affect, but that he refused to take anti-depressants. [AR 346] Plaintiff was described as "slow in responding" and appeared to have some mild cognitive impairments. [AR 345] Plaintiff indicated that his short-term memory was not as strong as his long-term memory and acknowledged that he tended to forget things. [AR 345] Nonetheless, Plaintiff told Dr. Eisemann that he was capable of doing certain tasks but did not want to do them, and described himself as lazy. [AR 347] Dr. Eisemann concluded that Plaintiff was engaged in malingering or factitious behavior and that he

9

could do more tasks than he chooses to do but that he lacks motivation. [AR 346] Dr. Eisemann did not propound any work limitations. [AR 348-49]

On March 10, 2018, Plaintiff underwent an independent medical examination by William H. Qutub, M.D. [AR 354-60] Dr. Qutub did not recommend any limitations for sitting, standing, walking, weight bearing, posture, or manipulation, and did not believe that Plaintiff needed assistive devices. [AR 359] Dr. Qutub did note, however, that seizure precautions needed to be flowed at all times. [*Id.*]

On March 20, 2018, state agency psychiatrist Ellen Ryan, M.D., reviewed Plaintiff's medical records and provided a mental residual functional capacity assessment. [AR 108-10] Dr. Ryan concluded that Plaintiff was moderately limited in his ability to carry out detailed instructions, to maintain attention and concentration for extended periods, to complete a normal workday and workweek without interruptions from psychologically-based symptoms, to interact with the general public, to get along with coworkers, to respond appropriately to changes in the work setting, and to set realistic goals or make plans independently of others. [*Id.*] Dr. Ryan opined that Plaintiff was "able to manage a simple daily routine and . . . adapt to less complex changes in work settings" and that Plaintiff could "do work of limited complexity requiring up to 3 months to learn." [AR 110]

On July 8, 2019, Plaintiff's treating therapist, Brooke Harrison, LPC, completed a mental impairment questionnaire. [AR 439-40] Ms. Harrison described Plaintiff as having "loose associations" with "below average intelligence." [AR 440] She indicated that Plaintiff became easily frustrated and had an anxious presentation. [*Id.*] She noted that Plaintiff was moderately impaired in his ability to interact with the general public, to get along with coworkers, and to maintain socially appropriate behavior. [*Id.*] She stated that

he had marked impairment in his ability to remember locations and work-like procedures, to carry out simple instructions, to maintain concentration for extended periods of time, to maintain a schedule, to work in coordination and proximity with others without being distracted, to accept instructions and respond to criticism, and to respond appropriately to changes in work setting.  [*Id.*]  Ms. Harrison indicated that Plaintiff was extremely impaired in his ability to make a simple work-related decision.  [*Id.*]  Ms. Harrison opined that Plaintiff would be absent from work more than three times a month and that he was not capable of performing a full-time job.  [*Id.*]

On April 17, 2020, Ms. Harrison completed a medical source statement.  [AR 533-46]  According to Ms. Harrison, Plaintiff had high: disturbance in mood, sleep disturbances, decreased energy, difficulty concentrating or thinking, emotional withdrawal or isolation, persistent disturbances of mood or affect, pervasive loss of interest, memory impairment, and persistent and irrational fear of activity.  [AR 534-35]  Ms. Harrison indicated that Plaintiff had moderate: perceptual or thinking disturbances, changes in personality, psychomotor retardation, feelings of guilt or worthlessness, easy distractibility, dyspraxia, repetitive speech, obsessions with rigid routines, difficulty organizing sequencing tasks, pathological dependence, passivity, or aggression, markedly restricted repertoire of activities, and incoherence or illogical thought.  [*Id.*]  She opined that Plaintiff would have extreme limitations in activities of daily living, maintaining social functioning, and maintaining concentration.  [AR 542]  She further opined that Plaintiff would have four or more episodes of decompensation within a twelve-month period, that Plaintiff's impairments would cause him to miss more than four days of work per month, and that he would be markedly limited in most abilities to perform routine

11

tasks. [AR 542-45] Ms. Harrison concluded that Plaintiff could not work eight hours a day, five days per week. [AR 546]

### C. Procedural History

Plaintiff's application for SSI was initially denied on January 26, 2018. [AR 97] On May 29, 2018, Plaintiff completed a request for a hearing before an ALJ. [AR 118-22] A hearing was conducted before ALJ Bryan Henry on July 9, 2020. [AR 36-80] Plaintiff was represented at the hearing by attorney Matthew Hudson. [AR 36] Plaintiff and Vocational Expert Dennis Duffin testified at the hearing. [AR 46-80]

On July 28, 2020, the ALJ issued a decision that Plaintiff had not been under a disability since November 13, 2017, the date his application was filed. [AR 15-30] Plaintiff timely requested a review of that decision by the Appeals Council, and on December 14, 2020, the Appeals Council denied Plaintiff's request for review. [AR 1-6] On February 15, 2021, Plaintiff timely filed his appeal with this Court. [#1]

### D. The ALJ's Decision

After evaluating the evidence pursuant to the five-step sequential evaluation process, the ALJ denied Plaintiff's application for SSI. [AR 15-30] At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since November 13, 2017, the application date. [AR 18] At step two, the ALJ found that Plaintiff had the following severe impairments: seizure disorder, obesity, and depression with anxiety distress. [*Id.*] At step three, the ALJ concluded that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in the appendix of the regulations. [AR 18-21]

Following step three, the ALJ determined that Plaintiff retained the RFC to perform a full range of work with the following restrictions:

> [Plaintiff] can occasionally climb ramps and stairs, but never climb ladders, ropes, or scaffolds.  He can never be required to balance as part of his job requirements.  He can never work around unprotected heights or dangerous moving machinery.  He can never be required to drive motor vehicles, of any type (including forklifts) on the job.  He should avoid flashing lights.  He can perform simple, routine, repetitive tasks.  He can have occasional contact with the public, co-workers, and supervisors.  He can complete simple, routine, repetitive tasks, for two-hour increments, and can retain concentration, persistence, and pace for a complete workday/week with normal breaks.

[AR 21]  The ALJ provided a narrative setting forth the evidence considered in determining the RFC and explaining the ALJ's consideration of the medical opinions in the record.  [AR 21-28]

At step four, the ALJ found that Plaintiff did not have any past relevant work.[5]  [AR 28]  At step five, the ALJ determined that there were jobs that existed in significant numbers in the national economy that Plaintiff could have performed, including jobs such as harvest worker, hand packager, housekeeper/cleaner, and food service worker.  [AR 29-30]  Based on this, the ALJ determined that Plaintiff was "not disabled" since November 13, 2017, the date of Plaintiff's application.  [AR 30]

---

[5] At step four, a claimant will be determined to be "not disabled" when it is determined that the claimant retains the RFC to perform either: (1) the actual functional demands and job duties of a particular past relevant job as performed by the claimant, or (2) the functional demands and job duties of that job as generally required by employers throughout the national economy.  *See* Social Security Ruling 82-61, 1982 WL 31387 (1982); *Andrade v. Sec'y of Health & Human Servs.*, 985 F.2d 1045, 1051 (10th Cir. 1993).

### III. ANALYSIS

On appeal, Plaintiff disputes the ALJ's determination that Plaintiff was not disabled. [*See generally* #18] Specifically, Plaintiff argues that the ALJ failed to properly evaluate the opinion of Plaintiff's treating therapist, Brooke Harrison, and "discounted [her] opinions for very faulty reasons." [*Id*.] The Court disagrees.

For claims for SSI filed prior to March 27, 2017, an ALJ is required to consider all of the medical opinions in the record and discuss the specific weight being assigned to them according to certain factors, including the type of relationship between the medical source and the claimant. See 20 C.F.R. § 416.927; *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1161 (10th Cir. 2012). Pursuant to the regulations applicable to claims filed prior to March 27, 2017, "[t]he opinion of an examining physician is generally entitled to less weight than that of a treating physician, and the opinion of an agency physician who has never seen the claimant is entitled to the least weight of all." *Robinson v. Barnhart*, 366 F.3d 1078, 1084 (10th Cir. 2004). Indeed, pursuant to those regulations, a treating source's medical opinion is entitled to "controlling weight" if it was "well-supported by medically acceptable clinical and laboratory diagnostic techniques and . . . not inconsistent with the other substantial evidence in [the claimant's] case record." 20 C.F.R. § 416.927(c)(2).

The Social Security Administration, however, has adopted a new framework for evaluating medical opinions for claims filed on or after March 27, 2017. *See Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 Fed. Reg. 5844 (Jan. 18, 2017); 20 C.F.R. § 416.920c. Because Plaintiff filed his claim for SSI in November 2017, these new regulations for the evaluation of medical opinions apply to his application. Under the

new regulations, the ALJ "[does] not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [the claimant's] medical sources."[6]   20 C.F.R. § 416.920c(a).  Instead, "the ALJ considers the persuasiveness of those opinions using five factors:  supportability; consistency; relationship with the claimant; specialization; and other factors, such as 'a medical source's familiarity with the other evidence in a claim.'" *Zhu v. Comm'r, SSA*, No. 20-3180, 2021 WL 2794533, at *5 (10th Cir. July 6, 2021) (quoting 20 C.F.R. § 416.920c(c)).  "The factors of supportability . . . and consistency . . . are the most important factors" and the ALJ thus must "explain how [they] considered the supportability and consistency factors for a medical source's medical opinions . . . in [the] determination or decision."[7]   20 C.F.R. § 416.920c(b)(2); *see also Zhu*, 2021 WL 2794533, at *6.

"'Supportability' examines how closely connected a medical opinion is to the evidence and the medical source's explanations: 'The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his

---

[6] The Social Security Administration explained its rationale for the change in approach as follows:

> By moving away from assigning a specific weight to medical opinions, we are clarifying both how we use the terms "weigh" and "weight" in final 404.1520c(a), 404.1527, 416.920c(a), and 416.927 and also clarifying that adjudicators should focus on how persuasive they find medical opinions and prior administrative medical findings in final 404.1520c and 416.920c.  Our intent in these rules is to make it clear that it is never appropriate under our rules to "credit-as-true" any medical opinion.

82 Fed. Reg. at 5858.

[7] "An ALJ must consider, but is not required to explicitly discuss, [the remaining three] factors . . . (relationship with the claimant, specialization, and other factors) unless there are differing medical opinions on an issue and those opinions are equally well-supported and consistent with the record."  *Zhu*, 2021 WL 2794533, at *6 n.9 (citing 20 C.F.R. § 416.920c(b)(2), (3))

or her medical opinion(s)[,] . . . the more persuasive the medical opinions . . . will be.'" *Zhu*, 2021 WL 2794533, at *6 (quoting 20 C.F.R. § 416.920c(c)(1)). "'Consistency,' on the other hand, compares a medical opinion to the evidence: 'The more consistent a medical opinion(s) . . . is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) . . . will be.'" *Id.* (quoting 20 C.F.R. § 416.920c(c)(2)). Put another way, the "consistency" factor "is an all-encompassing inquiry focused on how well a medical source is supported, or not supported, by the entire record." *Miles v. Saul*, No. 20-cv-1456-WJM, 2021 WL 3076846, at *3 (D. Colo. Jul. 21, 2021) (quotation omitted).

The ALJ found Ms. Harrison's opinions unpersuasive. [AR 27] According to the ALJ, "Ms. Harrison's opinion overstated [Plaintiff's] limitations and was unsupported by the medical evidence." [*Id.*] He noted that her "opinion came in the form of marks on a check-box form" and that "she did not reference specific treatment notes, clinical observations, or treatment recommendations that would support the marked to extreme limitations." [*Id.*] The ALJ also noted that Ms. Harrison's opinions were "inconsistent with her treatment notes" which often reflected "normal clinical observations" and "consistent progress, using only therapy." [*Id.*] With respect to Ms. Harrison's July 2019 opinion, the ALJ noted that Plaintiff "did not require more involved treatment, such as emergency room visits for psychiatric care, longer term inpatient care, a third party to manage his daily routine, or more involved treatment with [electroconvulsive therapy]." [*Id.*] Finally, the ALJ deemed Ms. Harrison's April 2020 opinion "internally inconsistent" because she noted extreme limitations in some areas but only marked limitations in others, and because she indicated that Plaintiff would have "extreme limitations with understanding,

16

remembering, concentrating, and persisting, [but] indicated that [Plaintiff] could manage his own benefits in his own interest." [AR 27-28]

Plaintiff argues that the ALJ erred by discounting Ms. Harrison's opinions due to the check-box from of that opinion. [#18 at 19] But, as another court in this district recently held:

> [The physician's] check-box opinion is not as detailed as other physicians' reports, and the Tenth Circuit has explained that check-box forms, unaccompanied by written reports or testimony, do not constitute substantial evidence. *See, e.g., Chapo v. Astrue*, 682 F.3d 1285, 1293 (10th Cir. 2012) (finding that an ALJ was "justified in rejecting [a] summary RFC opinion (related in check-box/fill-in-the-blank format with no explanation or supporting report"); *Frey v. Bowen*, 816 F.2d 508, 515 (10th Cir. 1987) ("In comparison with the objective tests and measurements described by [treating medical sources] in support of their diagnosis . . ., [the consulting physician's] report in this regard consists solely of boxes checked on the Secretary's form to indicate his conclusion. . . . Such evaluation forms, standing alone, unaccompanied by thorough written reports or persuasive testimony, are not substantial evidence."). Although categorical rejection of check-box forms is not appropriate where "there were other materials [in the record] that could lend support to the conclusions in the forms," *see Anderson v. Astrue*, 319 F. App'x 712, 724 (10th Cir. 2009) (unpublished), the ALJ did not categorically reject [the physician's] opinion because it was a check-box form. Ultimately, plaintiff has failed to show that [the physician's] opinion, even if it were more developed, is sufficient to overcome the other contradictory evidence of normal exam findings.

*Dawson v. Kijakazi*, No. 20-CV-03022-PAB, 2022 WL 1421257, at *5 (D. Colo. May 5, 2022). As in *Dawson*, the ALJ did not categorically reject Ms. Harrison's opinions because they followed a check-box format. Rather, he noted: (1) Ms. Harrison's lack of citation to treatment notes and clinical observations, (2) inconsistencies between Ms. Harrison's opinions and her treatment notes, which the ALJ had detailed earlier and again cited to in evaluating Ms. Harrison's opinions, and (3) the fact that treatment notes showed progress using only therapy and Plaintiff's apparent lack of a need for more involved

17

treatment. [AR 24, 27] Those were permissible reasons to discount Ms. Harrison's opinions. *See Frank v. Kijakazi*, No. 20-cv-00691-NYW, 2021 WL 3796620, at *6 (D. Colo. Aug. 25, 2021) ("By expressly citing record evidence with which the ALJ determined Dr. Bess's opinion to be inconsistent, the ALJ sufficiently evaluated the consistency of Dr. Bess's opinion as compared to the medical record as a whole and the court thus finds no error in his finding that Dr. Bess's opinion was not persuasive."); *Pearson v. Saul*, No. 20-cv-01808-NRN, 2021 WL 2549214, at *4 (D. Colo. June 22, 2021) (finding ALJ's rejection of physician's medical opinion "supported by evidence in the record" where ALJ rejected opinion, in part, due to the physician's "relatively conservative course of treatment"); *Kies v. Saul*, No. 19-cv-00848-REB, 2019 WL 6609473, at *3 n.8 (D. Colo. Dec. 5, 2019) ("Prior to assessing the medical opinions, the ALJ set forth a detailed recitation of the medical evidence relevant to plaintiff's alleged impairments. Having once discussed this evidence, the ALJ was not required to do so again.") (collecting cases); *see also Miles*, 2021 WL 3076846, at *5 (finding substantial evidence to support RFC where the treating providers' notes were inconsistent with their opinions and the opinions did not address improvement after treatment).

Plaintiff also challenges the ALJ's conclusion that Ms. Harrison's treatment notes were inconsistent with her opinions, citing certain record evidence that Plaintiff struggled with depression throughout 2018, 2019, and 2020.[8] [#18 at 21-22] As described above,

---

[8] Plaintiff also challenges the ALJ's conclusion that Ms. Harrison's April 2020 opinion was internally inconsistent. [#20 at 22] While the Court does not necessarily agree with the ALJ that Ms. Harrison's opinion was internally inconsistent, as detailed herein, the ALJ gave sufficient grounds for rejecting Ms. Harrison's opinion and it is not the role of this Court to "reweigh the evidence or substitute [its] judgment for the Commissioner's." *Hackett*, 395 F.3d at 1172.

however, while there were certainly periods in which Plaintiff's treatment notes reflected minimal improvement in Plaintiff's depression, other treatment notes, including the most recent treatment notes from 2020, reflect "moderate progress" toward Plaintiff's treatment goals.  [AR 570, 573, 576, 579, 582]  And thus while the Court agrees that "the administrative record contains some evidence that [Plaintiff's] conditions create significant limitations in the workplace[,] . . . the fact that the evidence could support another conclusion does not necessarily mean that the ALJ erred in [his] analysis." *Miles*, 2021 WL 3076846, at *4.  The ALJ provided substantial support for his conclusion that Ms. Harrison's opinions were unpersuasive, and the Court "may not displace the [ALJ's] choice between two fairly conflicting views, even though the court [may] justifiably have made a different choice had the matter been before it de novo." *Zoltanski v. F.A.A.*, 372 F.3d 1195, 1200 (10th Cir. 2004) (quotations omitted); *see also Newbold v. Colvin*, 718 F.3d 1257, 1265-66 (10th Cir. 2013) (holding that the ALJ properly explained his reasons for assigning little weight to the plaintiff's treating source where the ALJ discussed the inconsistencies between the treating source opinion and the medical record, the plaintiff's daily activities, and the treating source's own treatment notes); *Simmons v. Colvin*, 635 F. App'x 512, 515 (10th Cir. 2015) (concluding ALJ reasonably discounted one source's form opinion because the included impairment ratings "were far more extreme than his own treatment notes would suggest"); *Perone v. Astrue*, No. 11-cv-01568-LTB, 2012 WL 5240264, at *10 (D. Colo. Oct. 23, 2012) (finding no error where the ALJ found that a physician's opinions as to the claimant's RFC and capacity to work "were not consistent with the treatment records, exam findings, and other objective evidence of record, including [the physician's] own treatment records" (quotation omitted)); *Barnhill-Stemley*

*v. Colvin*, 607 F. App'x 811, 814-15 (10th Cir. 2015) ("Discrepancies between a treating physician's very restrictive functional assessment and that physician's contemporaneous treatment notes are a legitimate factor for discounting a medical opinion."). Accordingly, the Court finds that the ALJ adequately explained his rejection of Ms. Harrison's opinions and that such a rejection is supported by the record.

## IV.   CONCLUSION

For the foregoing reasons, **IT IS HEREBY ORDERED** that the decision of the Commissioner that Plaintiff has not been under a disability since November 13, 2017 is **AFFIRMED**.

DATED:  July 27, 2022                                    BY THE COURT:

                                                         s/Scott T. Varholak
                                                         United States Magistrate Judge